# EXHIBIT 1

<u>EXECUTION COPY</u>

LICENSE AGREEMENT

DATED AS OF NOVEMBER 15, 2000

BETWEEN

GEOFFREY BEENE, INC.

AND

ALLEGIANCE APPAREL GROUP, LLC

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "**Agreement**"), is made and entered into as of the 15th day of November, 2000, by and between Geoffrey Beene, Inc., a New York corporation with offices at 37 West 57th Street, 2nd Floor, New York, New York 10019 (hereinafter referred to as "**Licensor**"), and Allegiance Apparel Group, LLC, a Connecticut corporation with offices at 1599 Post Road East, Westport, Connecticut 06880 (hereinafter referred to as "**Licensee**").

## BASIC TERMS

1.    <u>Licensed Marks</u>.

    (a)    <u>Licensed Marks</u>.    As used in this Agreement, "**Licensed Marks**" means the following marks GEOFFREY BEENE, BEENE EASE and, subject to Paragraph 8(c) of these Basic Terms, G.B. BY GEOFFREY BEENE

    (b)    <u>Use of Licensed Marks</u>.    In addition to all other provisions of this Agreement applicable to the use of the Licensed Marks by Licensee, the following shall apply:

        (i)    The mark GEOFFREY BEENE shall be used by Licensee under this Agreement only in connection with Men's Products (as defined in Paragraph 2 of these Basic Terms) and sold in the permitted channels of distribution set forth on Exhibit A;

        (ii)    The mark BEENE EASE shall be used by Licensee on hang tags as required by Licensor and otherwise as mutually agreed by Licensor and Licensee; and

        (iii)    The mark G.B. BY GEOFFREY BEENE shall be used by Licensee under this Agreement only in connection with Men's Products (as defined in Paragraph 2 of these Basic terms) that are subject to Paragraph 8(c) of these Basic Terms and sold in the permitted channels of distribution set forth on Exhibit A.

    2.    <u>Men's Products</u>.    As used in this Agreement, **Men's Products**" means men's loungewear, fashion underwear, pajamas or other sleep wear, and robes, as approved by Licensor under the terms of this Agreement.    Without limitation of other requirements regarding Men's Products as set forth in this Agreement, all Men's Products shall be in a variety of fabrications that meet the approval of Licensor.

    3.    <u>Territory</u>.    As used in this Agreement, "**Territory**" means the United States of America and its territories and possessions.

    4.    <u>Term</u>. (a)    <u>Initial Term</u>.    The term of this Agreement (the "**Initial Term**") shall commence on the date hereof (the "**Commencement Date**"), and shall end on December 31, 2003, unless extended or earlier terminated pursuant to the terms of this Agreement (as so extended or earlier terminated, the "**Term**").    Each year during the Term shall be referred to herein as an "**Annual Period**", and shall run from January 1 to the following December 31.    The first "Annual Period" of this Agreement, however, shall commence on the Commencement Date and shall expire on December 31, 2001.

(b)    Options to Extend.    Licensee shall have three (3) options (each, an "**Option Period**") to extend the Term for a period of three (3) Years each, subject to satisfaction of the criteria set forth in these Basic Terms and in the Standard Terms and Conditions (including Paragraph 5(a) thereof) regarding such Option Periods.

5.    Administrative Fee.    Licensee shall pay Licensor the sum of $5,000 upon the execution of this Agreement as an administrative fee for the implementation of this License. This sum shall not be applied against any amounts payable by Licensee to Licensor for Licensee's activities hereunder, nor shall it be applied against any additional fees, costs or administration expenses that may be required under this Agreement. This fee is non-refundable upon the expiration of this Agreement or its earlier termination by either party for any reason whatsoever, and such fee is deemed earned upon the execution of this Agreement.

6.    Fees.    In consideration of the grant of the right to use the Licensed Marks, Licensee shall pay Licensor the fees set forth in Paragraphs 6(a) and 6(b).

(a)    Guaranteed Minimum Fee.    Licensee shall pay Licensor the following "**Guaranteed Minimum Fee**" for each Annual Period with respect to Men's Products:

| Annual Period (Initial Term) | Guaranteed Minimum Fee |
|---|---|
| 1 (ending December 31, 2001) | $125,000 |
| 2 (ending December 31, 2002) | $150,000 |
| 3 (ending December 31, 2003) | $200,000 |

| Annual Period (First Option Period) | Guaranteed Minimum Fee |
|---|---|
| 4 (ending December 31, 2004) | $250,000 |
| 5 (ending December 31, 2005) | $300,000 |
| 6 (ending December 31, 2006) | $400,000 |

| Annual Period (Second Option Period) | Guaranteed Minimum Fee |
|---|---|
| 7 (ending December 31, 2007) | $450,000 |
| 8 (ending December 31, 2008) | $500,000 |
| 9 (ending December 31, 2006) | $550,000 |

| Annual Period (Third Option Period) | Guaranteed Minimum Fee |
|---|---|
| 10 (ending December 31, 2007) | $600,000 |
| 11 (ending December 31, 2008) | $650,000 |
| 12 (ending December 31, 2009) | $700,000 |

(ii)

(b) <u>Percentage Fee</u>.  Licensee shall pay Licensor the following "**Percentage Fee**" for each Annual Period with respect to Men's Products:

| Net Sales Per Annual<br>Period of Men's Products | Percentage Fee |
| --- | --- |
| Up to $5,000,000 | 6% |
| $5,000,000 or more | 5% |

(c) <u>Payment; First Annual Period</u>.  The Guaranteed Minimum Fee and the Percentage Fee for each Annual Period shall be paid in accordance with Paragraph 3 of the Standard Terms and Conditions, except that the aggregate Guaranteed Minimum Fee of $125,000 due for the first Annual Period shall be payable as follows:  $41,250 on the date of this Agreement, $20,937.50 on December 31, 2000, and $20,937.50 on April 1, 2000, July 1, 2000 and October 1, 2001, Dec. 15, 2001 ur

7. <u>Guaranteed Minimum Net Sales</u>.  Licensee shall attain the following annual guaranteed minimum Net Sales of the Men's Products ("**Guaranteed Minimum Net Sales**") during the referenced Years, of which at least fifty percent (50%) shall consist of Net Sales of Men's Products utilizing the "GEOFFREY BEENE" mark in better department stores and better specialty stores:

| Annual Period<br>(Initial Term) | Guaranteed Minimum Net Sales |
| --- | --- |
| 1 (ending December 31, 2001) | $ 3,000,000 |
| 2 (ending December 31, 2002) | $ 4,000,000 |
| 3 (ending December 31, 2003) | $ 6,000,000 |

| Annual Period<br>(First Option Period) | Guaranteed Minimum Net Sales |
| --- | --- |
| 4 (ending December 31, 2004) | $11,000,000 |
| 5 (ending December 31, 2005) | $15,000,000 |
| 6 (ending December 31, 2006) | $17,000,000 |

| Annual Period<br>(Second Option Period) | Guaranteed Minimum Net Sales |
| --- | --- |
| 7 (ending December 31, 2007) | $19,000,000 |
| 8 (ending December 31, 2008) | $21,000,000 |
| 9 (ending December 31, 2006) | $22,000,000 |

**[continued]**

(iii)

| Annual Period (Third Option Period) | Guaranteed Minimum Net Sales |
|---|---|
| 10 (ending December 31, 2007) | $23,000,000 |
| 11 (ending December 31, 2008) | $24,000,000 |
| 12 (ending December 31, 2009) | $25,000,000 |

8.    Distribution.

(a)    Commencement of Distribution.  Licensee shall commence distribution of the Articles no later than ~~December 31, 2000~~. July 31, 2001 *(handwritten)*

(b)    Channels of Distribution.  Licensee agrees to sell the Articles with the Licensed Mark only in the permitted channels of distribution set forth on and subject to the conditions set forth in **Exhibit A.**  Without limiting the foregoing, Licensee agrees that, absent the prior written consent of Licensor, Licensee will not sell or distribute Men's Products (1) to any person or entity who does not sell at retail in the Territory except as set forth on **Exhibit A**, (2) to swap meets, flea markets, parking lot sales, warehouse sales, factory outlet stores, discount stores or similar sellers which maintain minimum quality standards, or (3) to any person or entity who Licensee knows or reasonably suspects will re-sell the Men's Products outside of the Territory or through unapproved channels of distribution (such as the World Wide Web, the Internet or any other public network); and Licensee will not provide assistance to any entity (other than an International Licensee (as defined in the Standard Terms and Conditions)) in selling Men's Products outside of the Territory.

(c)    Termination of Right to Use G.B. BY GEOFFREY BEENE and To Sell In Price Clubs.  Licensee agrees that no Articles bearing any Licensed Mark other than G.B. BY GEOFFREY BEENE will be sold to any approved Price Club.  Licensee further agrees that its right to use the mark G.B. BY GEOFFREY BEENE and to sell Men's Products in price clubs under this Agreement may be terminated by Licensor, without adjustment to the Guaranteed Minimum Fee due from Licensee to Licensor or the Guaranteed Minimum Net Sales requirements, in the event that any or all of the following conditions have occurred at any time during the Term:

(i)    Licensee markets, sells, or distributes Men's Products (as defined in Paragraph 2 of these Basic Terms) bearing the mark G.B. BY GEOFFREY BEENE in or through any Distribution Channel other than the price club listed on **Exhibit A** hereto, or such other price club mutually agreed to by Licensor and Licensee in writing (such breach shall also constitute a default under Paragraph 11 of the Standard Terms and Conditions);

(ii)    Licensee markets, sells, or distributes more than two SKUs per season for Men's Products bearing the mark  G.B. BY GEOFFREY BEENE; or

(iii)    Licensor determines, in its sole and absolute discretion, that either or both the marketing, sale, or distribution of Men's Products bearing the mark G.B. BY GEOFFREY BEENE and/or the sale of Men's Products bearing the Licensed Marks in price

(iv)

clubs, has reduced or will reduce the value of the Licensed Marks or other trademarks owned by Licensor, or has derogated or will derogate the Licensed Marks or other trademarks of Licensor, or has detracted, or will detract, from the repute of the Licensed Marks or other trademarks owned by Licensor, or adversely affects its traditional business with department store or specialty store customers, or otherwise adversely affects Licensor's business.

In the event of termination by Licensor under this Paragraph 8(c), Licensee shall have 180 days from the date of notice of such termination to complete pending orders then in production and to ship such orders.  In no event may Licensee take new orders after notice of such termination, except to liquidate Men's Products covered by this Paragraph 8(c) that are in production but not yet sold, and in no event may new orders be taken for such Men's Products.

(d)  Web; Right of First Refusal.  Subject always to Licensor's right, as set forth in Paragraph 2(b) of the Standard Terms and Conditions, to use the Licensed Marks in the Territory on and in connection with sales on the Internet, World Wide Web, or any other public network ("**Internet Sales**") of products bearing the Licensed Marks, Licensee shall have the right to match the terms (the "**Matching Offer**") of any third party proposal received by Licensor during the Term regarding Internet Sales of Men's Products bearing the Licensed Marks.  Licensor shall be permitted to enter into an agreement with such third party regarding Internet Sales unless the Matching Offer and closure thereof satisfy the following conditions:  (i) the Matching Offer is received by Licensor within 15 days of Licensor's notice to Licensor of the third-party proposal, (ii) the Matching Offer does not propose a term longer than the Term of this Agreement, unless otherwise agreed by Licensor and Licensee, and (iii) within 30 days after Licensor's receipt of the Matching Offer, Licensor and Licensee have entered into an agreement regarding Internet Sales substantially conforming to the terms of the Matching Offer.

9.  Advertising.  During each Annual Period, Licensee shall spend for regional and national advertising no less than an amount equal to the greater of (i) the aggregate of the Guaranteed Minimum Fee for such Annual Period and (ii) two percent (2%) of the Net Sales for such Annual Period (the "**Advertising Budget**"), except that during the first and second Annual Periods, the Advertising Budget shall be set at two percent (2%) of the Net Sales for each such Annual Period.  A portion of the Advertising Budget for each Annual Period equal to the cost of two full-page four-color advertisements in a publication to be selected by Licensor (the "**Full-Page Ad Fee**"), plus Licensee's proportionate share of creative costs, shall be paid directly to Licensor and the balance of the Advertising Budget shall be used by Licensee in accordance with Paragraph 7 of the Standard Terms and Conditions.  The Full-Page Ad Fee shall not exceed the lesser of $100,000 or 50% of the Advertising Budget.  During the first Annual Period, the Full-Page Ad Fee may accrue as of the date of this Agreement, but shall not be payable by Licensee until March 2001.  Licensee agrees that it shall not advertise the mark G.B. BY GEOFFREY BEENE.

10.    <u>Notices</u>.  Addresses for notices:

To Licensor:                          To Licensee:

Geoffrey Beene, Inc.                  Allegiance Apparel Group, LLC
37 West 57th Street, 2nd Floor        1599 Post Road East
New York, New York  10019             Westport, Connecticut 06880
Attn:  President                      Attn:  Joe Laurita
Tel.: (212) 371-5570                  Tel.:(203)319-3600
Fax: (212) 980-6579                   Fax:  (203-319-3610

Copy To:                              Copy To:

G. Thompson Hutton, Esq.              Tom Sargent, Esq.
Law Offices of G. Thompson Hutton     Sargent & Sargent, LLC
13 E. 69th Street, Suite 2R            830 Post Road East
New York, New York  10021             Westport, CT  06831
Fax: (212) 472-7711                   Fax:  (203) 226-6445

11.    <u>Standard Terms and Conditions</u>.  IN ADDITION TO THESE BASIC TERMS,
LICENSEE AGREES TO COMPLY WITH THE STANDARD TERMS AND CONDITIONS
APPENDED TO THIS AGREEMENT AND MADE A PART HEREOF BY THIS
REFERENCE.  LICENSEE, BY ITS EXECUTION OF THIS AGREEMENT,
ACKNOWLEDGES THAT LICENSEE HAS READ THE STANDARD TERMS AND
CONDITIONS AND AGREES TO BE BOUND ACCORDINGLY AND AGREES THAT
EXCEPT AS SET FORTH IN THIS AGREEMENT, NEITHER LICENSOR NOR ANY OF
ITS EMPLOYEES, AGENTS OR REPRESENTATIVES HAVE MADE ANY PROMISES OR
REPRESENTATIONS TO LICENSEE CONCERNING THE SUBJECT MATTER OF THIS
AGREEMENT AND THAT ANY PROMISES OR REPRESENTATIONS NOT EXPRESSLY
SET FORTH IN THIS AGREEMENT ARE OF NO FORCE OR EFFECT.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date stated
above.

GEOFFREY BEENE, INC.                  LICENSEE:


By:_____            By:_____
Geoffrey Beene                        Name:  Christopher Healy
President                             Title:   Chief Executive Officer

<u>Personal Guarantees</u>

To induce Licensor to enter into this License Agreement, each of the signatories hereto (each a "**Guarantor**") jointly and severally guarantee the payment when due of all Guaranteed Minimum Fees set forth as payable by Licensee to Licensor during the Initial Term under this Agreement and shall promptly pay any such amounts which are not paid by Licensee for any reason, without deduction for any right of recourse, defense, deduction, counterclaim, offset, or setoff which Licensee may have, together with interest and all costs and expenses (including legal fees and expenses of attorneys chosen by Licensor) incurred by Licensor because of Licensee's default or because of any default under these guarantees. Each Guarantor's guarantee is an absolute, unconditional, and unlimited guarantee of payment and either Guarantor's guarantee may be proceeded upon by Licensor before taking any action against Licensee, or after action against the Licensee has been commenced. The obligations of Guarantors hereunder shall not be discharged or impaired or otherwise affected by the failure of Licensor to assert any claim or demand or to enforce any remedy under this Agreement, by any waiver, modification, or amendment of any provision hereof, by any default, failure, or delay, willful or otherwise, in the payment by Licensee of amounts payable under this Agreement, or by subrogation to the rights of Licensor or otherwise, to any payment by Licensee or out of or in respect of the property of Licensee, except after payment in full of all sums (including interest, costs, and expenses) which may be or become payable by Licensee to Licensor at any time or from time to time pursuant to this Agreement or otherwise. Licensor may proceed against any Guarantor, with or without proceeding against the other Guarantors or Licensee. Each Guarantor hereby irrevocably consents to the jurisdiction of the courts of the State of New York and of any federal court located in such state in connection with any action or proceeding arising out of or relating to these Guarantees.

IN WITNESS WHEREOF, the undersigned have executed these Guarantees on this 15th day of Dec, 2000.

_____
Christopher Healy

_____
William Sweedler

_____
Joseph Sweedler

_____
David Sweedler

_____
Joseph Laurita

_____
Chris Laurita

_____
Alan B. Rummelsburg

(vii)

## STANDARD TERMS AND CONDITIONS

1.      <u>Terms Not Defined Herein</u>.  These Standard Terms and Conditions are a part of the License Agreement to which they are appended.  All capitalized terms used but not otherwise defined in these Standard Terms and Conditions shall have the meanings given to them in the Basic Terms.  If any conflict occurs between the Basic Terms and these Standard Terms and Conditions, the Basic Terms shall control.

2.      <u>Grant of License</u>.

(a)      <u>License</u>.  Licensor hereby grants to Licensee, on the terms and conditions in this Agreement, an exclusive license (the "**License**"), limited to the Territory, to use the Licensed Marks in connection with the manufacture, marketing, sale and distribution solely of the Men's Products.  All Men's Products designed or approved by Licensor pursuant to this Agreement are referred to as the "**Articles**".

(b)      <u>Reservation of Rights</u>.  Licensor reserves all rights to the Licensed Marks and any mark other than the Licensed Marks, except those rights specifically granted herein to Licensee, and Licensor may exercise such reserved rights at any time.  Without limitation of the foregoing, Licensor reserves the right (i) to use and to grant to others the right to use the Licensed Marks and any mark other than the Licensed Marks in the Territory on and in connection with Men's Products (A) designed for sale in Geoffrey Beene retail stores in major manufacturers' outlet malls and major manufacturers' outlet centers (the "**GB Stores**"), and (B) designed to sell at the designer level and at any other reserved price point set forth in **Schedule 1** to this Agreement, (ii) to manufacture, and to grant to others the right to manufacture, Men's Products in the Territory solely for export and (iii) to use and to grant to others (subject to Licensee's right of first refusal set forth in Paragraph 8(d) of the Basic Terms) the right to use the Licensed Marks in the Territory on and in connection with sales on the Internet, World Wide Web, or any other public network, of products bearing the Licensed Marks and Men's Products.  Licensee is aware of and hereby acknowledges that Licensor has entered and may enter into licenses with various licensees for the use of the Licensed Marks and other trademarks of Licensor in the Territory and elsewhere in connection with Men's Products that are listed and distinguishable from Articles, including, but not limited to, activewear, sportswear and children's loungewear.  In the event of a dispute between Licensee and any other licensee of Licensor with respect to the Men's Products or the territory covered by their respective licenses, such dispute shall be resolved by Licensor, in its sole discretion.  Licensor's determination shall be final and binding and Licensee shall continue to comply with all other provisions of this Agreement.

(c)      <u>Subcontracting</u>.  Licensee may have Articles manufactured for it by contractors in any country in the world who are approved in accordance with the provisions of Paragraph 6(c).  Nevertheless, Licensee acknowledges that it has been advised that Takashimaya Co., Ltd. ("**Takashimaya**") has been granted an exclusive license to manufacture, market, sell, and distribute Men's Products in Japan (the "**Takashimaya Territory**").  Although Licensee may manufacture or contract with others to manufacture Articles in the Takashimaya Territory,

1

Licensee acknowledges that it may not, and agrees that its sources may not sell Articles in the Takashimaya Territory. If Licensee is notified that one of its sources is selling Articles in the Takashimaya Territory and, after notice from Licensee, such source continues to sell Articles in the Takashimaya Territory, then Licensee will thereafter cease doing business with that source as long as such source continues to sell in Articles in the Takashimaya Territory.

     3.    <u>Fees and Reporting</u>.

     (a)    <u>Fees</u>. (1) The Guaranteed Minimum Fee for each Annual Period shall be paid in four equal quarterly installments (each a **"Quarterly Guaranteed Minimum Fee Payment"**) on the first day of each January, April, July and October during such Annual Period, except that, during the first Annual Period, $41,250 of the Guaranteed Minimum Fee shall be paid on the date of this Agreement and the balance shall be paid in accordance with Paragraph 6(c) of the Basic Terms. Notwithstanding the foregoing, no amount shall be payable by Licensee to Licensor in payment of the Guaranteed Minimum Fee for any Annual Period if the sum of all Quarterly Guaranteed Minimum Fee Payments and Quarterly Percentage Fee Payments (as hereinafter defined) theretofore paid Licensor for such Annual Period equals or exceeds the Guaranteed Minimum Fee for such Annual Period. Nothing set forth in this Paragraph 3(a) shall alter the right of Licensor to receive, or the obligation of Licensee to pay, any Quarterly Percentage Fee Payments that may be due during the remainder of such Annual Period, in accordance with the terms of this Agreement.

     (2)    The Quarterly Guaranteed Minimum Fee Payments for an Annual Period shall be credited only against such Quarterly Percentage Fee Payments as are made in the same Annual Period and in accordance with the provisions of Paragraph 3(a)(4) below.

     (3)    In the event of the termination of this Agreement pursuant to paragraph 11, all amounts due in payment of Guaranteed Minimum Fees for the balance of the Initial Term, or, if this Agreement has been extended, the then current Option Period, shall immediately, without notice or demand, become due and payable.

     (4)    The Percentage Fee shall be paid in quarterly installments (each a **"Quarterly Percentage Fee Payment"**) during each Annual Period. The Quarterly Percentage Fee Payment for each three-month period (other than the last three-month period) during each Annual Period shall be paid simultaneously with the delivery of the statement referred to in Paragraph 3(f)(1) below relating to such three-month period during such Annual Period, and the Quarterly Percentage Fee Payment for the last three-month period of each Annual Period shall be paid simultaneously with the delivery of the report referred to in Paragraph 3(f)(2) below relating to such Annual Period. The Quarterly Percentage Fee Payment for each such three-month period shall be computed on the basis of Net Sales from the beginning of such Annual Period to the last day of the most recent three-month period, with a credit for the Quarterly Guaranteed Minimum Fee Payments and for the Quarterly Percentage Fee Payments theretofore paid to Licensor for such Annual Period. In the event that the Percentage Fee for an Annual Period exceeds the Guaranteed Minimum Fee for such Annual Period, under no circumstances shall such excess amount be credited against the Guaranteed Minimum Fee due to Licensor for any other Annual Period.

(b) <u>Advertising Budget</u>.  The Licensor's portion of the Advertising Budget shall be paid to Licensor within five business days of Licensor's request therefore, which request during the first Annual Period shall be subject to Paragraph 9 of the Basic Terms.  Licensor agrees to provide, upon the request of Licensee at the end of any Annual Period, details of the expenditure during such Annual Period of that portion of the Advertising Budget remitted to Licensor.

(c) <u>Net Sales</u>. For purposes of this Agreement, "**Net Sales**" shall be deemed to mean the invoiced amount of Articles sold by Licensee or any of its affiliates, less customary and usual trade discounts actually granted, returns actually allowed and actually received, and charges for customs duty, freight, and sales taxes, if any.  No deduction shall be made for other discounts, uncollectible accounts, advertising, or other costs incurred by Licensee.  If a sale, transfer, or other disposition is made otherwise than at arm's length, the Net Sales price of such Article shall be deemed to be the Net Sales price of a corresponding sale at arm's length.

(d) <u>Payments</u>.  (1)  All payments made hereunder by Licensee to Licensor shall be made in New York City, New York, in United States Dollars by wire transfer or check drawn on a New York clearinghouse bank or otherwise in immediately available funds. Licensee may not make any deductions or offsets from payments due to Licensor.  Licensee shall not be relieved of its obligation to make payments required hereinabove notwithstanding any circumstances which make it impossible for Licensor or Licensee to take payments out of any jurisdiction in the Territory.  In the event that Licensee shall be prevented by any law, decree, or regulation of the Territory or any governmental authority therein from transmitting any payment hereunder at the time and in the manner provided herein or if for any other reason it shall become impossible or impracticable for Licensor to take any payment hereunder out of the Territory (i) Licensee shall, not later than the date on which such transmittal is required to be made hereunder, deposit the full amount thereof to the credit of Licensor in such bank or depository as Licensor shall specify and furnish evidence of such deposit to Licensor and (ii) Licensor may, at its sole election, terminate this Agreement forthwith by written notice. Licensee shall apply at its sole expense for all export or currency licenses, and shall take all other actions which may be necessary or expedient to facilitate the prompt receipt by Licensor of all payments hereunder in the manner and at the times provided herein.

(2)  Licensee shall compute and pay on behalf of Licensor all taxes, other than income and other taxes based on income, which any governmental authority in any country other than the United States may impose on Licensor with respect to the amounts paid to Licensor by Licensee.  The amount of such taxes paid by Licensee shall be deducted from each payment of the Quarterly Percentage Fee Payment.  Licensee shall furnish Licensor with an official receipt in the language of the country and a translation thereof promptly after each such payment of taxes.  In the event such taxes are not paid when due, all resulting penalties and interest imposed on Licensor shall be borne by Licensee.

(e) <u>Reports</u>. (1)  Licensee shall deliver to Licensor within 30 days following the end of each three-month period (other than the last three-month period) during each Annual Period, a statement signed by the chief financial officer of Licensee and certified as accurate, indicating by month and by individual Article the amount of Net Sales during such three-month period. Each such statement shall also indicate in detail, separately for each jurisdiction in the

3

Territory and for each customer and SKU, the number, description, invoice price, and the total amount of gross sales of all Articles shipped during the period covered, the amount of actual trade discounts, returns, and charges for customs duty, freight, and sales taxes which may be deducted therefrom, a computation of the amount of the Quarterly Percentage Fee Payment payable hereunder in respect of such Net Sales for such period, and also the amount and details of the advertising and promotional expenses relating to the Articles and the Licensed Marks incurred during such period. Such statements shall be in a format approved by Licensor and furnished to Licensor whether or not any Articles have been sold during the period for which such statement is due.

(2)    Licensee shall deliver to Licensor within 45 days following the end of each Annual Period, a report certified by the chief financial officer of Licensee covering such Annual Period and containing the same information required to be contained in the statements referred to in Paragraph 3(f)(1) above.

(3)    All monetary amounts shall be expressed in United States Dollars. In the event Licensee makes any sales denominated in foreign currency, the Quarterly Percentage Fee Payment shall be expressed both in the currency of the country in which each Article was sold and in United States Dollars, the latter on the basis of the average buying rate and selling rate of the country's currency to United States Dollars in effect in the capital city of such country on the last banking day of such quarter.

(f)    <u>Books and Records; Audits</u>.    (1)    Licensee shall prepare and maintain, in accordance with generally accepted accounting principles consistently applied, complete and accurate books of account and records (including without limitation the originals or copies of documents supporting entries in the books of account) covering all transactions relating to the License hereby granted. Upon reasonable notice and at reasonable intervals, Licensor and its duly authorized representatives shall have the right, during regular business hours, to examine such books of account and records and all other documents and materials in the possession or under the control of Licensee with respect to the subject matter and the terms of this Agreement and Licensor shall have free and full access thereto for such purposes and for the purpose of making extracts therefrom. All such books of account, records, and documents shall be kept available by Licensee for at least three years after the Annual Period to which they relate.

(2)    If, as a result of any examination of Licensee's books and records, it is shown that Licensee's fee payments or Advertising Budget expenditures for any period were less than the amount which should have been paid and/or expended for such period, Licensee shall, subject to the balance of this paragraph, pay immediately on demand such additional amounts, and if either the fee payments or the Advertising Budget expenditures were less than the sum that should have been paid and/or expended by an amount equal to at least five percent of the fee or Advertising Budget expenditure actually paid and/or expended during such period, Licensee shall also reimburse Licensor for the cost of such examination. If, as a result of any such audit, it is shown that Licensee's fee payments for any period were less than the amount that should have been paid for such period by an amount equal to at least five percent of the fee actually paid during such period, then Licensor may, at its option and in addition to its right to payment and reimbursement pursuant to the preceding sentence, terminate this Agreement upon ten days' notice to Licensee. If, as a result of any such audit, it is shown that Licensee's

4

Advertising Budget expenditures for any period were less than the amount that should have been expended for such period by an amount equal to at least five percent of the Advertising Budget expenditure actually expended during such period, Licensee shall be required to either pay such additional amount immediately to Licensor, or within 20 days of notice of such under-expenditure, provide a plan to Licensor reasonably detailing the disbursement of the unexpended Advertising Budget. Failure by Licensee to deliver such plan shall result in the automatic termination of this Agreement with no further notice to Licensee. In the event that any sales during the disputed period were denominated in a foreign currency, the payments required to be made with respect to such sales shall be calculated in accordance with exchange rates in effect both at the time payment was due and at the time payment was made. The amount of reimbursement shall be the higher of such two calculations.

(g)  <u>Financial Statements</u>. Licensee agrees to provide Licensor copies of its audited financial statements (including balance sheet, statements of income, stockholders' equity and changes in financial position, and the related notes thereto) within 90 days following the end of each fiscal year of Licensee ending during the Term.

(h)  <u>Acceptance of Reports and Statements</u>. The receipt and/or acceptance by Licensor of any statements furnished, or amounts paid hereunder, including, but not limited to the cashing of any checks paid hereunder (regardless of Licensee's endorsement on such checks), shall not preclude Licensor from questioning the correctness thereof at any time. In the event that any inconsistencies or mistakes are discovered in such statements or payments, Licensee shall immediately rectify such mistakes and the appropriate payment shall be made by Licensee in accordance with this Agreement.

4.  <u>Exploitation of License</u>.

(a)  <u>Continuous Sale</u>. Licensee agrees to use best efforts to exploit the License throughout the Territory and to manufacture, sell, and distribute, without interruption, the maximum quantity of Articles therein.

(b)  <u>Seasons</u>. During each Annual Period, Licensee shall offer for sale the number of collections of Articles set forth in **Schedule 1**. Without limiting the best efforts requirement of Paragraph 4(a) above, each collection offered by Licensee shall consist of no fewer than the number of Articles, each in no fewer than the number of color combinations, as may be set forth in **Schedule 1**. Notwithstanding the foregoing, Licensee's first offering under this Agreement shall be as set forth in **Schedule 1**.

(c)  <u>Adequate Personnel; Facilities</u>. Licensee shall at all times and solely at its expense maintain (or contract for) facilities and trained personnel adequate to fulfill its obligations under this Agreement. During the term of this Agreement, Licensee shall maintain a separate showroom exclusively for the display of the Articles. Such showroom shall be located in New York City or such other city as may be mutually agreed upon as set forth in **Schedule 1** and shall be physically separate from any other showroom maintained by Licensee, but may be part of the premises containing other showrooms of Licensee. Such showroom shall be in a location suitable for the display of items of the highest quality, consistent with the prestige and reputation which

Licensor and the Licensed Marks have developed heretofore, and appropriate to maintain such quality image. All costs relating to the showroom shall be borne solely by Licensee.

    (d)    <u>Cooperation with Shops</u>. Licensee acknowledges that during the term of this Agreement one or more Geoffrey Beene boutiques or GB Stores (hereinafter referred to, collectively, as a "**Shop**") may be operated in the Territory, either by Licensor or by third party licensees of Licensor. In such event, Licensee agrees to cooperate with each Shop and to use its best efforts timely to supply each Shop with Articles in reasonable quantities and on such terms of purchase and sale as are mutually agreed upon by Licensee and the Shop from time to time.

    (e)    <u>Competing Lines</u>. Licensee agrees that during the term of this Agreement, neither Licensee nor its affiliates will use any other celebrity or designer's name or trademarks in the Territory in connection with any Articles or any Men's Products for which the target market is for sales at suggested retail price points of twenty dollars ($20) to thirty dollars ($30) in better department stores or better specialty stores. Licensee agrees that it will not market, sell or distribute Articles or Men's Products that would infringe on the aforementioned target market or on Licensor's market position with respect to Articles or Men's Products. Nothing herein shall prevent Licensor and Licensee from developing Articles for distribution and sale hereunder for which the suggested retail price point shall be above thirty dollars ($30) in better department stores or better specialty stores. Licensee shall appoint a National Sales Manager or fill a similar position with an employee who shall dedicate his or her full-time attention and efforts to the development and maintenance of lines of Articles pursuant to the terms of this Agreement.

    5.    <u>Term</u>.

    (a)    <u>Extension of Term</u>. Licensee may extend the Term of this Agreement for an Option Period if Licensee: (i) shall notify Licensor in writing (the **"Option Notice"**) of its intention to extend the Term no later than six months, but no earlier than nine months, prior to the date on which this Agreement is scheduled to expire; (ii) shall not be in breach of this Agreement upon the date of notification of its intention to extend the Term; (iii) shall not be in breach of this Agreement upon the scheduled expiration of the Term; (iv) shall not have received more than one notice of default from Licensor, regardless of whether such default or defaults were cured; and (v) has met the Guaranteed Minimum Net Sales requirements and makes the payments required by the Basic Terms through the scheduled expiration of the Term. For the purposes of this Agreement, the Term shall include the Initial Term plus any Option Period for which Licensee has exercised its option. Licensee understands and agrees that, during any extension of the Term, Licensee shall continue to be bound by the terms and conditions of this Agreement.

    (b)    <u>Disposal Period</u>. The Term shall include any applicable Disposal Period (as hereinafter defined), provided, however, the License shall not be exclusive during the Disposal Period.

    6.    <u>Quality Control</u>.

    (a)    <u>Standards</u>. Licensee agrees that the design, contents, workmanship, fit and all other characteristics of the Articles shall at all times be of the highest quality, consistent with the prestige and reputation which Licensor and the Licensed Marks have developed heretofore, and

the Articles shall be sold and distributed with packaging and sales promotion materials appropriate to maintain such quality image. All Articles will be manufactured, sold, labeled, packaged, distributed, and advertised in accordance with all applicable laws and regulations.

(b)    Approvals/Samples. (1)  Licensor shall have the right to approve the styles, designs, packaging, contents, workmanship, and quality of all Articles to insure that Articles manufactured, sold, or distributed hereunder are consistent with the quality standards set forth herein.

(2)    At Licensor's request, Licensee will deliver to Licensor or make available to Licensor in New York City free of any cost to Licensor then current production samples of Articles produced hereunder so that Licensor may assure itself of the maintenance of the quality standards set forth herein.  Licensee agrees that all Articles to be sold hereunder will be at least equal in quality to the samples delivered or made available to Licensor and approved by Licensor.

(3)    Approximately the number of months set forth in **Schedule 1** prior to each scheduled showing date, Licensee shall submit to Licensor, in the form of boards or other medium acceptable to Licensor, the styles, designs, prototypes, models, concepts, materials, sketches, colorations, fabrications, fabric swatches and samples which are being considered for inclusion in the then current seasonal collection of Articles, from which Licensor may select those of which Licensor approves for use in connection with that collection of Articles.  Failure by Licensor to select proposed samples within 30 days of receipt thereof shall be deemed approval. No style, design, prototype, model, concept, material, sketch, coloration, fabrication, fabric swatch or sample may be used by Licensee in connection with the Articles unless Licensor shall have approved such use.  Licensor may submit styles, designs, prototypes, models, concepts, materials, sketches, colorations, fabrications, fabric swatches and samples to Licensee for use in connection with collections of Articles.  Licensee agrees promptly to reimburse Licensor for any such items submitted. Licensor may use and permit others to use concepts, materials, sketches, colorations, fabrications, and samples in any manner it desires, provided that such use does not conflict with any rights granted Licensee hereunder.

(4)    No design submitted or approved by Licensor and used in a collection or any substantially similar design may be used again in a subsequent collection or in any other line of Licensee without the approval of Licensor.

(5)    Licensee will be responsible for all sample making and for the production of the Articles and Licensee will bear all costs in connection therewith.  Licensee will reimburse Licensor and Licensor's employees for any out-of-pocket expenses incurred at Licensee's request, whether for travel or otherwise.

(6)    No later than one month prior to the initial public presentation of each collection of Articles, Licensee shall make available to Licensor in New York City for its inspection, free of any charge, the entire collection of Articles consisting of one sample of each separate Article together with its tags, labels, and packaging.

(c)    On-Going Quality Control and Inspections. (1)  Licensee shall deliver to Licensor for its review and files within ten days after the execution of this Agreement a copy of

any written internal quality control procedures and policies utilized by Licensee. If there shall be any material change in such procedures or policies, Licensee shall send to Licensor a copy of its written policies disclosing such changes.

(2)    Licensee shall not enter into any agreement with any third party for the manufacture of Articles without the prior consent of Licensor. In order to maintain Licensor's high standard of quality control and to insure that appropriate measures are taken against counterfeiting, Licensee will advise Licensor of the following information prior to obtaining Licensor's consent: (i) name and address of each proposed manufacturer; (ii) type and style of Articles to be manufactured; and (iii) any other relevant information reasonably requested by Licensor. Failure by Licensor to approve any third party manufacturer within 30 days of notice thereof by Licensee shall be deemed approval. Licensee will also obtain the signature of an authorized representative from each third party manufacturer used by Licensee on an agreement, in the form attached hereto as **Exhibit B** and designed to protect Licensor's rights in the Licensed Marks.

(3)    Upon reasonable notice to Licensee and at reasonable intervals, Licensor and its duly authorized representatives shall have the right, during regular business hours, to examine Articles in the process of being manufactured and to inspect all facilities utilized by Licensee in connection with the manufacture of Articles.

(4)    At any time during the Term, Licensor may notify Licensee if any of the samples or any of the Men's Products being manufactured, sold or distributed by Licensee fail to meet the design or quality standards for that style or line of Men's Products as represented by the sample(s) approved by Licensor. The judgment of Licensor as to whether any Men's Products fail to meet the quality standards of the original sample shall be binding. Licensee agrees that, upon receipt of notification that certain Men's Products do not meet such standards, Licensee shall immediately take all necessary steps to bring such Men's Products into conformance with approved samples.

(d)    <u>Seconds and Irregulars</u>. All Articles will bear a tag or label bearing the appropriate Licensed Mark. The form of each label or marking must be approved by Licensor. Notwithstanding the first sentence of this Paragraph 6(d), the Licensed Marks must be removed from all Articles sold by Licensee as "seconds," "irregulars," at less than the percentage of their regular wholesale prices set forth in **Schedule 1**, or if sold by Licensee from surplus inventory to any store (other than a GB Store) that is located in a "major manufacturers' outlet mall" or a "major manufacturers' outlet shopping center", but all of such sales shall be included in any calculation of Net Sales (as hereinafter defined). Licensee acknowledges that substantial sales of Articles at prices below their regular wholesale prices could have an adverse effect on the value of any of the Licensed Marks and agrees to sell no more than the percentage of any individual Article set forth in **Schedule 1** at less than regular wholesale prices without first conferring with and obtaining the approval of Licensor.

(e)    <u>Disclaimer</u>. In providing any information hereunder Licensor is acting in an advisory capacity only and Licensor shall have no responsibility for the operation or production of the manufacturing, distribution, advertising, or sales facilities owned or used by Licensee or for any decisions that may be made in connection therewith, whether upon the

8

recommendation of Licensor or otherwise.

7.    Advertising.

(a)    National Advertising.  During each Annual Period, Licensee shall spend for regional and national advertising (which shall be defined as advertising placed in prestigious magazines, other prestigious print media or prestigious equivalents in other media that are distributed nationally or in one or more regions in the United States and directed to the retail consumer) of the Articles and the Licensed Marks (other than the mark G.B. BY GEOFFREY BEENE which Licensee shall not advertise) the Advertising Budget less the amounts of the Advertising Budget required to be remitted to Licensor.

(b)    Approvals.  (1) Licensee shall submit proposed advertisements for Licensor's approval, including specific details as to the contents, budget, timing, and media placement of such advertisements and must receive written approval before proceeding with such advertisements.  Failure by Licensor to approve proposed advertisements within 30 days of its receipt thereof shall be deemed approval.  After any advertisement has been provided or approved by Licensor, Licensee shall not depart in any respect from the contents, budget, timing, and media placement specified and approved by Licensor, without the prior approval of Licensor.  If Licensor fails to give approval of the contents, the budget, the timing, or the media placement of any advertisement submitted by Licensee, such advertisement shall not be used in any manner.

(2)  No credit will be given for advertising of Articles at sale prices.

(3)  In the event that during any Annual Period Licensee has not in fact spent on national advertising the entire portion of the Advertising Budget not required to be remitted to Licensor, then Licensee shall remit to Licensor, within 90 days after the end of such Annual Period, the balance of the Advertising Budget, without credit to the Advertising Budget for the then current Annual Period.  Sums spent for advertising shall be spent for co-op and consumer advertising of the Articles and the Licensed Marks, and no credit will be given toward the Advertising Budget for the costs of the following:  advertisements containing other products or marks, sale merchandise, in-store displays or other store promotions (including store fixtures, signage and giveaways), showroom displays or materials or trade shows.

8.    Trademark and Copyright Protection.

(a)    Except as provided in Paragraph 6(d), all Articles shall bear the appropriate Licensed Mark, as designated in Paragraph 1 of the Basic Terms.  Neither Articles nor any modifications or adaptations thereof may be manufactured, marketing, sold, or distributed by Licensee under any mark other than the appropriate Licensed Mark.  Licensee acknowledges that it has been granted no rights to any other trademarks owned or used by Licensor or to the name, likeness or signature of Mr. Geoffrey Beene (except to the extent that it is granted the right to use the Licensed Marks pursuant to this Agreement) and that such other trademarks may be used by Licensor and by such third parties to which Licensor has granted or may grant the right to use such trademarks.

(b)    Licensee agrees that no name or names shall be used in connection with the Licensed Marks in any advertising, publicity, labeling, packaging, or printed matter of any kind utilized by Licensee in connection with the Articles except as Licensor may, from time to time, consent in writing.  Licensee agrees to use its best efforts to prevent the unauthorized use of the Licensed Marks and of any derivatives thereof.  Licensee agrees not to use the Licensed Marks or the name or likeness of Mr. Geoffrey Beene or any derivative thereof in its corporate name or business name or, unless approved by Licensor, on its business stationery, purchase orders, invoices, or letterhead.

(c)    Licensee acknowledges that, as between Licensee and Licensor, Licensor is the owner of all right, title, and interest in and to the Licensed Marks throughout the world in any form or embodiment thereof and is also the owner of the goodwill attached or which shall become attached to the Licensed Marks.  Sales by Licensee shall be deemed to have been made by Licensor for purposes of trademark registration and all uses of the Licensed Marks by Licensee shall inure to the benefit of Licensor.  Licensee shall not do or suffer to be done any act or thing which will in any way adversely affect any rights of Licensor in and to the Licensed Mark or any registrations thereof or which, directly or indirectly, will reduce the value of any of the Licensed Marks or detract from its reputation.

(d)    Licensee shall timely execute any documents, including without limitation Registered User agreements and applications to record the Licensee as a Registered User, to confirm Licensor's ownership of all rights in and to the Licensed Marks in the Territory and the respective rights of Licensor and Licensee pursuant to this Agreement.  Licensee will cooperate with Licensor, in connection with the filing and prosecution by Licensor of applications in Licensor's name to register the Licensed Marks for Articles in the Territory and the maintenance and renewal of such registrations as may issue and will share equally with Licensor any and all costs incurred as a result thereof.

(e)    Licensee will use the Licensed Marks in the Territory strictly in compliance with applicable legal requirements and will use such markings in connection therewith as may be required by applicable laws.

(f)    Licensee will never challenge Licensor's ownership of or the validity of the Licensed Marks or any application for registration thereof, or any trademark registrations thereof, or any rights of Licensor therein.

(g)    Any copyright which may be created by Licensee in any sketch, design, print, package, label, tag, or the like designed or approved by Licensor will be the property of Licensor.  Licensee will not, at any time, do or suffer to be done any act or thing which may adversely affect any rights of Licensor in such sketches, designs, prints, packages, labels, tags, and the like and will, at Licensor's request, do all things reasonably required by Licensor to preserve and protect said rights.

(h)    Licensee will use and display the Licensed Marks only in such form and manner as is specifically approved by Licensor.  Licensee will cause to appear on all Articles produced hereunder, on their tags, labels, final sale packaging, and the like, on all advertising

10

and promotional material used in connection therewith, and on all materials on which the Licensed Marks appears, including without limitation business cards, invoices, order forms, and stationery, such legends, markings, and notices as may reasonably be necessary in order to give appropriate notice of any copyright, trademark, trade name, or other rights therein or pertaining thereto, or as Licensor may reasonably request. At least 45 days before using or releasing any such material, Licensee shall submit to Licensor, for its approval, proposed promotional material, all printed material, and finished art work for tags, labels, final sale packaging, and the like.

(i)    Licensee acknowledges that the Licensed Marks have acquired a valuable secondary meaning and goodwill with the public, and that products bearing the Licensed Marks have acquired a reputation of highest quality and style. Accordingly, notwithstanding any provision in this Agreement to the contrary, Licensee undertakes and agrees not to use the Licensed Marks in any manner whatsoever which, directly or indirectly, would derogate or detract from their repute. Licensee agrees that use which would cause such derogation and detraction would include, by way of specification and not in limitation, sales of Articles to retail establishments which are not "better full line department stores" or "better specialty stores" as those terms are used in the couture fashion market in the New York metropolitan area or which are not Shops, except as otherwise approved by Licensor on **Exhibit A** hereto as the approved distribution. Licensee recognizes that the undertaking on its part set forth in this paragraph represents a major inducement and consideration for Licensor to enter into this Agreement and will consult with Licensor regarding its plans for marketing and distributing Articles.

(j)    Licensee acknowledges that Licensor has made no representation or warranty that Licensor has enforceable legal rights in and to the Licensed Marks in any jurisdiction other than the United States and its possessions. In the event that Licensor does not have such rights in any foreign jurisdiction or jurisdictions, such event shall not be deemed to be a breach or default under this Agreement.

(k)    In the event that Licensee learns of any infringement or imitation of the Licensed Marks or of any use by any person of a trademark similar to the Licensed Marks in the Territory on items of the type included in the Articles, it shall promptly notify Licensor thereof in writing and if, in Licensee's reasonable opinion, such infringement, imitation, or use also constitutes an infringement of the rights herein granted to Licensee, Licensee shall specifically so state in its notice. In such latter case, if appropriate action is not taken by Licensor within 20 days after the date of its receipt of such notice from Licensee, Licensee shall have the right to prosecute such trademark infringer, but in such event Licensee will keep Licensor advised in advance of its intentions in such action, will consult with Licensor with respect thereto, and will not settle such action without Licensor's written approval (which approval may not be unreasonably withheld). If, however, Licensor does take such action, Licensor shall permit Licensee to join such action as an additional plaintiff. In either case, Licensor and Licensee agree to cooperate fully with the party conducting the action. Any recovery obtained against the third-party infringer shall be applied first against the legal fees incurred in connection with such action and shall then be allocated between Licensor and Licensee in the same proportion as the judgment or decision, as the case may be, allocates damages or the award; if such judgment or decision fails to make such allocation, such shall be determined by mutual agreement or by

11

arbitration in New York City in accordance with and pursuant to the then existing rules of the American Arbitration Association.

9.   Compliance with Law.

(a)   Regulatory and Legal Matters.   During the term of this Agreement, Licensee shall obtain and maintain in full force and effect and at its own cost and expense all necessary governmental licenses (including export licenses), permits, clearances, registrations and authorizations, and all necessary trade association or industry self-regulatory organization registrations, and shall maintain compliance in all respects with the terms and conditions thereof and with all applicable laws and regulations, relating to the activities of Licensee and its manufacturers and subcontractors, if any, in the manufacture, sale, production and quality control of the Men's Products hereunder. Licensee hereby assumes all health, safety and environmental risks arising out of the design and manufacture hereunder of the Men's Products, and shall carry out all testing, safety, environmental and quality control programs for the Men's Products as are required by law, good manufacturing practice or industry standards. Any pre-production approval Licensor may give will not imply a representation or belief by Licensor that such materials comply with any applicable laws or regulations.

(b)   Ethical Sourcing.   With respect to each shipment of the Men's Products, Licensee certifies to Licensor as follows:

The merchandise covered by this shipment was produced in compliance with all applicable requirements of (1) Sections 6, 7 and 12 of the Fair Labor Standards Act, as amended (the "FLSA"), and all regulations and orders of the U.S. Department of Labor issued under Section 14 thereof; (2) state and local laws pertaining to child labor, minimum wage and overtime compensation; and (3) with respect to merchandise (including components thereof) manufactured outside the United States, the wage and hour laws of the country of manufacture and without the use of child, prison or slave labor. We further certify that we have in effect a program of monitoring any sub-contractors who performed work for us in connection with the production of the merchandise that is the subject of this Agreement for compliance with the FLSA and comparable state, local and foreign laws.

10.   Additional Covenants of Licensee.   Licensee covenants and agrees that:

(a)   Licensee agrees that it will not sell or distribute Articles (1) to any person or entity who does not sell at retail in the Territory, (2) to swap meets, flea markets, parking lot sales, warehouse sales, factory outlet stores (other than Geoffrey Beene outlet stores) or similar sellers, (3) to any person or entity who Licensee knows or reasonably suspects will re-sell the Articles outside of the Territory or through unapproved channels of distribution, including but not limited to, e-commerce sales on the worldwide web; and Licensee will not provide assistance to any entity in selling Articles outside of the Territory.

(b)   Licensee shall not give away Articles or sell Articles in connection with any tie-in or promotional campaign relating to products other than the Articles.

12

11.    Termination.

(a)    Defaults. (1) If Licensee shall fail to pay any amount due hereunder within seven days of the date on which such payment is due, (A) Licensee agrees to pay interest, at a rate equal to the lesser of (i) three percent per annum over the prime rate being charged in New York City by Marine Midland Bank as of the close of business on the date the payment first becomes due and (ii) the highest rate then permitted by law, on such amount remaining unpaid from time to time from and including the date such amount becomes due until the date such amount is paid in full and (B) if such default shall continue uncured for a period of fifteen days after written notice thereof ("Notice of Default") has been given by Licensor, Licensor shall have the right to terminate this Agreement, which termination may be automatic, at the option of Licensor, upon notice thereof in the Notice of Default or in any subsequent notice to Licensee. If Licensee discontinues the manufacture, distribution and sale of Articles for a period of sixty or more days, Licensor shall have the right to terminate this Agreement forthwith. If Licensee shall otherwise fail to perform any of the terms, conditions, agreements, or covenants in this Agreement on its part to be performed and such default shall continue uncured for a period of fifteen (15) days after a Notice of Default has been given by Licensor, Licensor may, at its sole election, terminate this Agreement, which termination may be automatic upon notice thereof in the Notice of Default or in any subsequent notice to Licensee. Notwithstanding the preceding sentence, if the breach by Licensee of any of the terms, conditions, agreements, or covenants in this Agreement (i) shall not, in Licensor's opinion, be capable of cure, the Notice of Default shall so state and this Agreement may be terminated immediately and (ii) is capable of being cured, but only over a longer period of time, and Licensee is proceeding diligently to cure the default in a manner satisfactory to Licensor, then, for so long as Licensee is proceeding in such manner, Licensor may not terminate this Agreement. Licensee agrees that in the event of any default under this Paragraph 11(a) or in the event of a breach by Licensee of any other provision of this Agreement, Licensee shall be responsible for all costs, including without limitation legal fees and expenses, incurred by Licensor as a result thereof, including legal fees and expenses in connection with any bankruptcy or organizations proceeding, including stay litigation. Nothing in this Paragraph 11(a) shall be deemed to waive Licensor's right to obtain damages for any default by Licensee, whether cured or uncured nor release Licensee from any obligations hereunder which survive termination of this Agreement.

(b)    Bankruptcy. (1) In the event Licensee files a petition for an order of relief under any bankruptcy law, or if a petition for an order of relief is filed against it and is not discharged or dismissed within 60 days thereafter, or if it becomes insolvent, or makes an assignment for the benefit of its creditors, or files a petition or otherwise seeks relief under or pursuant to any bankruptcy, insolvency, or reorganization statute or proceeding, or if it discontinues its business, or if a custodian, receiver, or trustee is appointed for it or a substantial portion of its business or assets, Licensor may, at its sole election, terminate this Agreement by written notice effective 60 days after such filing or such other aforementioned event.

(2)    No assignee for the benefit of creditors, custodian, receiver, trustee in bankruptcy, sheriff, or any other officer of the court or official charged with taking over custody of Licensee's assets or business shall have any right to continue this Agreement or to exploit or in any way use any of the Licensed Marks if Licensor exercises its right of termination pursuant to Paragraph 11(b)(1).

13

(3)    Notwithstanding the provisions of Paragraph 11(b)(2), in the event that, pursuant to any bankruptcy law, a trustee of Licensee (hereinafter referred to as the "Trustee") or Licensee as debtor in possession is permitted to assume this Agreement and does so and, thereafter, desires to assign this Agreement to a third party, which assignment (A) satisfies the requirements of such bankruptcy law, (B) is to a party that has established a reputation for producing products of the same type as the Articles and of a quality that is at least equal to the quality of Articles produced by Licensee and consistent with the standards set forth in this Agreement for Articles, (C) is to a party that can demonstrate its financial ability to perform the obligations of Licensee pursuant to this Agreement, and (D) provides that any payments in excess of the amounts set forth hereunder be paid only to Licensor, the Trustee, or Licensee, as the case may be, shall notify Licensor of the terms of such proposed assignment in writing. The giving of such notice shall be deemed to constitute an offer to Licensor to have this Agreement assigned to it or to its designee for the consideration, or its equivalent in money, and upon such terms, as are specified in the notice. The aforesaid offer may be accepted only by written notice given to the Trustee or Licensee, as the case may be, by Licensor within 15 days of Licensor's receipt of the notice from such party. If Licensor fails to give its notice to such party within the said 15 days, such party may complete the assignment referred to in its notice, but only if such assignment is to the entity named in the notice and for the consideration and upon the terms specified therein. Nothing contained herein shall be deemed to preclude or impair any rights which Licensor may have as a creditor in any proceeding or shall be deemed to be a consent to any assignment.

(c)    <u>Obligations on Expiration or Termination</u>.    On the expiration or termination of this Agreement for any reason whatsoever, all the rights of Licensee hereunder shall forthwith terminate and automatically revert to Licensor and Licensee shall forthwith discontinue all use of the Licensed Marks and shall no longer have the right to use the Licensed Mark or any variation or simulation thereof. Licensee shall thereupon deliver to Licensor, free of charge, all labels, tags, and other material in its possession with any of the Licensed Marks thereon and Licensee shall cause stencils, sketches, and other design materials not in its possession to be destroyed or rendered unusable. Licensee agrees not to reproduce or adapt any of such stencils, sketches, or other design materials for use on merchandise subsequent to the termination of this Agreement.

(d)    <u>Rights Upon Expiration or Termination</u>. Notwithstanding the provisions of Paragraph 11(c), in the event of the expiration or termination of this Agreement other than by Licensor in accordance with Paragraph 11(a), Licensee shall be permitted, for an additional period of six months only (the "Disposal Period"), on a non-exclusive basis, to sell and dispose of its inventory of Articles from the final collection prepared and manufactured pursuant to this Agreement prior to such termination or expiration (but no other Articles) on hand on the date of such termination or expiration, subject to an accounting for and the payment of the Percentage Fee on sales during such additional period and subject to the other terms and conditions of this Agreement. Such accounting and payment shall be due within 30 days after the last day of such six-month period.

14

(e)   <u>Licensor's Rights Prior to Expiration</u>. Licensor reserves the right at its option to enter into agreements with third parties prior to the termination of this Agreement pursuant to which such third parties may manufacture, sell, and, subsequent to the expiration of this Agreement, distribute Men's Products in connection with any of the Licensed Marks in the Territory for collections subsequent to the final collection sold pursuant to this Agreement.

(f)   <u>Elimination of Certain Men's Products or Jurisdictions</u>. (1) In the event any Men's Product shall not be included in any collection shown during any Annual Period or shall not be marketed on a significant basis in the judgment of Licensor consistent with the intent of this License during any Annual Period, such Men's Product may be withdrawn by Licensor and deleted from the definition of Men's Products, with no reduction in any of the amounts payable by Licensee pursuant to this Agreement, and upon such withdrawal of any such Men's Product, Licensor shall have the right to manufacture, market, sell, and distribute, or to license others to manufacture, market, sell, and distribute, such Men's Product in the Territory with the Licensed Marks thereon.

(2)   In the event that Licensee shall not market Articles in any jurisdiction in the Territory on a significant basis in the judgment of Licensor consistent with the intent of this License during any Annual Period, such jurisdiction may be removed from the definition of the Territory, with no reduction in any of the amounts payable by Licensee pursuant to this Agreement, and upon such withdrawal of any such jurisdiction, Licensor shall have the right to manufacture, market, sell and distribute, or to license others to manufacture, market, sell, and distribute, Men's Products in such jurisdiction with the Licensed Marks thereon.

(3)   Any withdrawal of a Men's Product or a jurisdiction shall be final and binding on Licensee and this Agreement shall terminate with respect to such Men's Product or jurisdiction, but shall remain effective with respect to the balance of the Men's Products or jurisdictions.

(g)   <u>Remedies</u>.  Since a breach of the provisions of this Agreement by Licensee could not adequately be compensated by money damages, Licensor shall be entitled, in addition to any other right or remedy available to it, to an injunction restraining such breach or a threatened breach and to specific performance of any such provision of this Agreement, and in either case no bond or other security shall be required in connection therewith, and Licensee hereby consents to the issuance of such injunction and to the ordering of specific performance. Notwithstanding the foregoing or any other provision of this Agreement, Licensor shall have and hereby reserves all the rights and remedies which it has, or which are granted to it by operation of law, with respect to the collection of fees payable by Licensee pursuant to this Agreement, with respect to damages for breach of this Agreement by Licensee, with respect to the recovery from Licensee of all costs incurred by Licensor as a result of any breach of this Agreement by Licensee, including without limitation all legal fees and expenses, and to enjoin the unlawful and unauthorized use of the Licensed Marks.  The exercise of any rights or remedies available to Licensor shall not preclude the concurrent or subsequent exercise by it of any other right or remedy and all rights and remedies shall be cumulative.  Without limiting the foregoing, the parties acknowledge that the breach by Licensee of this Agreement would cause substantial damages to Licensor, including, but not limited to, loss of "presence" in the marketplace while a successor or replacement licensee is located.

15

12.   Representations and Warranties.  Licensee represents and warrants that it has full right, power, and authority to enter into this Agreement.  Licensee and the Guarantors have delivered to Licensor the financial information of Licensee set forth in **Schedule 1.**  Licensee represents and warrants that such information presents fairly the information purported to be shown therein, has been prepared in accordance with generally accepted accounting principles, is correct and complete, and is in accordance with the books and records of Licensee.  Licensee further represents that since providing such financial information there has at no time been a material adverse change in the financial condition or projections of Licensee and there is no fact which materially adversely affects or in the future may materially adversely affect the financial condition, business or projections of Licensee.

13.   Assignment; Binding Effect.  Neither this Agreement nor the License or other rights granted hereunder may be assigned, sublicensed, or transferred by Licensee, except as specifically provided in Paragraph 11(b)(3), and any attempted violative assignment, sublicense, or transfer, whether voluntary or by operation of law, shall be void and of no force or effect.  The following events shall be deemed to be an assignment: (x) a change of control of Licensee, (y) a transfer of all or a controlling portion of the stock of Licensee, or (z) such time, if any, when Christopher Healy no longer holds the position of Licensee's Chief Executive Officer, or equivalent position, unless such event is the result of his death or incompetency, in which case such event shall not be deemed an assignment, provided that his replacement in such position is suitable to Licensor.  Notwithstanding the foregoing, (a) a merger of Licensee into another corporation for the sole purpose of changing domicile shall not be deemed a change of control of Licensee if the current stockholders of Licensee remain the sole stockholders of the surviving corporation, (b) a transfer of shares to direct descendants of the current stockholders or their spouses shall not be deemed a change of control of Licensee, (c) a transfer of shares to an employee stock ownership plan shall not be deemed a change of control of Licensee if the current stockholders, their direct descendants, or their spouses hold active management positions in Licensee, and (d) no transfer of shares shall be deemed to be a change of control if the current stockholders, their direct descendants or their spouses control more than 50% of the stock of Licensee and also have the power to elect a majority of the members of Licensee's Board of Directors.  Except as otherwise provided herein, this Agreement shall inure to the benefit of and shall be binding upon the parties and their respective successors and assigns.

14.   Indemnification.  Licensee does hereby indemnify and agrees to save and hold Licensor, and its officers, directors, shareholders, employees, and agents harmless of and from any and all liability, claims, causes of action, suits, losses, damages, and expenses (including, but not limited to, reasonable attorneys' fees and expenses) for which they or any of them may become liable or may incur or be compelled to pay in any action or claim (including, but not limited to, any action or claim relating to products liability) against them or any of them, for or by reason of any acts, whether of omission or commission, that may be committed or suffered by Licensee or any of its affiliates, agents, or employees in connection with Licensee's performance of this Agreement or in connection with the manufacture, marketing, sale or distribution of the Articles.  The indemnitees shall give Licensee prompt written notice of any such action or claim and Licensee may then, in its sole discretion, take such action as it deems advisable to defend such action or claim on behalf of the indemnitees.  In the event appropriate action is not taken by Licensee within 20 days of its receipt of notice from the indemnitees, the indemnitees shall have

16

the right to defend such action or claim, but no settlement thereof may be made without the approval of Licensee (which approval may not be unreasonably withheld). In any case, the indemnitees and Licensee shall keep each other fully advised of all developments and shall cooperate fully with each other in all respects in connection with any such defense as is made.

The provisions of this paragraph and Licensee's obligations hereunder shall survive the expiration or termination of this Agreement.

15.    Insurance. Licensee shall procure and maintain at its own expense in full force and effect at all times during which Articles are being sold, with a responsible insurance carrier acceptable to Licensor, a public liability insurance policy including products liability coverage with respect to the Articles and contractual coverage relating to this Agreement, with a limit of liability of not less than $2,000,000 (United States). Such insurance policy shall be written for the benefit of Licensee, Licensor, and Licensor's officers, directors, shareholders, employees, and agents, and shall provide for at least 30 days' prior written notice to Licensor and Licensee of the cancellation or modification thereof. Such insurance may be obtained by Licensee in conjunction with a policy of insurance which covers products other than the Articles. Licensee shall deliver to Licensor, promptly upon issuance of same, a full and complete copy of such insurance policy and of all renewals thereof. Nothing contained in this Paragraph 15 shall be deemed to limit, in any way, the indemnification provisions of Paragraph 15.

16.    Confidentiality. Licensee acknowledges that all information relating to the business and operations of Licensor which it learns or has learned during or prior to the term of this Agreement and all concepts, materials, sketches, colorations, fabrications, and samples received by it from Licensor are valuable property of the Licensor. Licensee acknowledges the need to preserve the confidentiality and secrecy of such information and samples and agrees that, both during the term of this Agreement and after the termination hereof, it shall not use or disclose the same, except as provided below, and it shall take all necessary steps to ensure that use by it or by its contractors (which use shall be solely as necessary for, and in connection with, the manufacture, marketing, distribution, or sale of Articles) shall preserve in all respects such confidentiality and secrecy. Nothing herein shall impose any liability or obligation upon Licensee in so far as it relates to information concerning Licensor that is or becomes generally available to the public other than as a result of disclosure by Licensee. Licensee hereby indemnifies Licensor against any damage of any kind which may be suffered by the Licensor as a result of any breach by Licensee of the provisions of this Paragraph 12. Licensee shall obtain from each of its contractors a confidentiality agreement containing provisions substantially the same as the provisions of this paragraph which confidentiality agreements shall name the Licensor as a third party beneficiary. The provisions of this paragraph and Licensee's obligations hereunder shall survive the expiration or termination of this Agreement.

17.    General Provisions.

(a)    Approvals. (1)  Whenever Licensor's approval is required pursuant to this Agreement, such approval shall not be effective unless given in writing.

17

(2)    After any item submitted for approval pursuant to this Agreement has been approved, Licensee shall not depart therefrom in any respect without the prior approval of Licensor. If Licensor disapproves any such item, it shall not be used in any manner.

(3)    Licensee acknowledges that Licensor's approval or disapproval of any matters may be based, without limitation, solely on Licensor's subjective aesthetic standards.

(b)    Notices. All reports, approvals, and notices required or permitted by this Agreement to be given to a party shall be in writing and shall be deemed to be duly given at the time of receipt if personally delivered or mailed by certified or registered mail, return receipt requested, to the party concerned at its address as set forth in the Basic Terms of this Agreement (or at such other address as a party may specify by notice to the other). All reports, approvals, and notices given to Licensor shall be addressed to the attention of its President and all reports, approvals, and notices given to Licensee shall be addressed to the attention of its President. Copies of all reports, approvals, and notices sent to Licensor must also be sent to the Law Offices of G. Thompson Hutton, 13 E. 69th Street, Suite 2R, New York, New York 10021, Attention: G. Thompson Hutton, Esq.

(c)    Entire Agreement. This Agreement contains the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, supersedes all prior oral and written understandings and agreements relating thereto, and may not be modified, discharged, or terminated orally.

(d)    Waivers. Any waiver by either party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement. Any waiver must be in writing. Acceptance of any payments or partial payment of any obligation due pursuant to any provision of this Agreement shall not constitute a waiver of any violation of or default under any of the provisions of this Agreement or be deemed to satisfy the full obligation of the payor.

(e)    Separability. If any provision of this Agreement is declared invalid, illegal, or unenforceable, such declaration shall not, in and of itself, nullify the remaining provisions of this Agreement unless Licensor, in Licensor's discretion, decides that such declaration is contrary to the original intent of the parties, in which event this Agreement shall terminate on thirty days' prior notice from Licensor to Licensee. The balance of this Agreement shall remain in effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other persons and circumstances.

(e)    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

(f)    Facsimile Signatures. This Agreement shall become binding and enforceable upon a party at such time as a counterpart has been signed and either deposited in the

18

mail, or transmitted via facsimile to the other party. In the event of transmittal by facsimile, the signed counterpart shall be deposited in the mail within twenty-four (24) hours thereafter, but the failure to do so shall have no effect on the enforceability of this Agreement.

(g) <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to principles of conflict of laws. However, any and all disputes, controversies, and claims arising out of or relating to this Agreement and pertaining to Licensor's ownership of or the validity in any country of any of the Licensed Marks or any registration thereof or any application for registration thereof shall be governed by and construed in accordance with the trademark laws and related laws, statutes, rules, and regulations of such country unless there are no laws, statutes, rules, or regulations in such country dispositive of such disputes, controversies, and claims, in which case any and all such disputes, controversies, and claims shall be governed by and construed in accordance with the federal trademark laws and related laws, statutes, rules, and regulations of the United States unless there are no federal laws, statutes, rules, or regulations of the United States dispositive of such disputes, controversies, and claims, in which case any and all such disputes, controversies, and claims shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to principles of conflict of laws.

(h) <u>Relationship of Parties</u>. Nothing herein contained shall be construed to constitute the parties hereto as partners or as joint venturers, or either as agent of the other, and Licensee shall have no power or authority to assume or create any obligation or responsibility whatsoever, express or implied, on behalf of or in the name of Licensor, to bind Licensor in any manner, or to make any representation, warranty, or commitment on behalf of Licensor.

(i) <u>Jurisdiction and Service of Process</u>. Licensee hereby irrevocably consents to the jurisdiction of the courts of the State of New York and of any federal court located in such State in connection with any action or proceeding arising out of or relating to this Agreement (other than as contemplated by the last sentence of Paragraph 8(j)), any document or instrument delivered pursuant to, in connection with, or simultaneously with this Agreement, or a breach of this Agreement or any such document or instrument. In any such action or proceeding, Licensee waives personal service of any summons, complaint, or other process and agrees that service thereof may be made in accordance with Paragraph 13(b). Within 30 days after such service, or such other time as may be mutually agreed upon in writing by the attorneys for the parties to such action or proceeding, Licensee shall appear or answer such summons, complaint, or other process. Should Licensee so served fail to appear or answer within such 30-day period or such extended period, as the case may be, Licensee shall be deemed in default and judgment may be entered by Licensor against Licensee for the amount as demanded in any summons, complaint, or other process so served.

(j) <u>Government Approvals</u>. Licensee agrees to obtain, at its expense, any and all required approvals of this Agreement or any of the transactions contemplated hereby by any government in the Territory outside of the United States or any agencies or subdivisions thereof.

(k) <u>Survival of Terms</u>. All terms, conditions, obligations and provisions capable of surviving the termination or expiration of this Agreement shall so survive.

19

(l)    <u>Brokerage Indemnity</u>. Each of Licensee and Licensor agrees to indemnify Licensor the other against any and all liabilities (including, without limitation, reasonable attorneys' fees and disbursements paid or incurred in connection with any such liabilities) for any brokerage or finder's fees or other commissions or fees that may be asserted against such party by reason of any actions of the other or on the other's behalf in connection with or as a result of this Agreement or the transactions contemplated hereby.

(m)    <u>Headings</u>. The headings in this Agreement are solely for convenience of reference and shall be given no effect in the interpretation or construction of this Agreement. Each party hereto agrees that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement. As used in this Agreement, the words "include" and "including," and all variations thereof, shall not be deemed to be terms of limitation.

(n)    <u>Further Actions</u>. At any time and from time to time, each party agrees, without further consideration, to take such actions and to execute and deliver such documents as may be reasonably necessary to effectuate the purposes of this Agreement.

READ, ACKNOWLEDGED AND APPROVED:

Licensee

By: _____
    Name:    Christopher Healy
    Title:     President, Chief Executive Officer

20

## SCHEDULE 1

1.    **Paragraph 2(b) - Additional Reserved Price Points:**

Any retail price points other than $20-30.

2.    **Paragraph 2(b) - Current Licensees with Similar Products:**

Phillips Van Heusen

3.    **Paragraph 4(b) -**

(a)    **Number and Description of Collections in Each Annual Period:**

2 collections per Annual Period:  Spring/Summer and Fall/Winter

(b)    **Minimum Number of Articles/Color Combinations Per Collection:**

As mutually agreed to by Licensor and Licensee.

(c)    **First Collection:**  Fall 2000, to be shown to Licensee's customers on or about January/February 2000, and to be delivered in September 2000.

4.    **Paragraph 4(c) - Location of Showroom (if outside of New York City):**

5.    **Paragraph 6(b)(3) - Submissions to be made two months prior to scheduled showing.**

6.    **Paragraph 6(d) -**

(a)    **percentage of regular wholesale price below which labels must be removed:** 40% below regular wholesale

(b)    **percentage of individual Articles that may be sold at less than regular wholesale prices:** 10%

7.    **Paragraph 12 - Financial Information Delivered:**

Projections for Licensee and Net Worth Statements for Guarantors

EXHIBIT A

<u>CHANNELS OF DISTRIBUTION</u>

I.  <u>For the mark "Geoffrey Beene"</u>

(a)  <u>Better Department Stores and Better Specialty Stores</u>

| | |
|---|---|
| Federated Department stores | May Company |
| Dillards | Saks Inc. |
| Belk | Dayton Hudson |
| Stage Stores | Nordstrom |
| Neiman's | Bon Ton |
| Boscovs | Gottschalks |
| Jacobson's | Men's Wearhouse |
| Steinmart | Mercantile |
| Frederick Atkins | Proffits |

(b)  <u>Outlet stores</u>

Geoffrey Beene outlet stores

(c)  <u>Off-price stores (for close-outs only)</u>

Marmax
Ross
Value City
Burlington

II.  <u>For the mark "GB by Geoffrey Beene"</u>

Price Clubs (only channels to which Men's Products bearing G.B. BY GEOFFREY BEENE may
be sold, and subject <u>to Licensor's termination rights set forth in License Agreement)</u>
Sams Club
Costco

EXHIBIT B

[MANUFACTURER'S LETTERHEAD]

[Licensee]

Gentlemen:

[Licensee] has indicated a desire to have us manufacture for Licensee [list Articles] designed or approved by Geoffrey Beene , Inc. (the "Articles" and "GBI", respectively) for sale in connection with certain trademark[s] (the "Licensed Mark") owned by GBI. In consideration of Licensee giving us the orders to manufacture the Articles and in order for you to obtain the consent of GBI thereto, we hereby agree and acknowledge as follows:

1.      We have been granted no rights to any trademarks owned by GBI, except the right to attach labels bearing the Licensed Mark solely to items that we are advised by Licensee have been designed or approved by GBI.  Such items will be sold and shipped solely to Licensee or to Licensee's customers, upon Licensee's instructions, and in no event will they be shipped to any party outside of [Territory].

2.      We will not affix labels bearing any trademark other than the Licensed Mark to any items which Licensee advises us have been designed or approved by GBI.

3.      We will keep confidential, prior to use, all designs, samples, concepts, materials and fabrications given to us by Licensee and the same may be used only in connection with the manufacture of Articles for Licensee.

4.      GBI is a third party beneficiary of this Agreement.

5.       This Agreement shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law.

Very truly yours,

[Manufacturer]

By: _____
       Name:
       Title:

ACKNOWLEDGED:

LICENSEE

By: _____
       Name:
       Title:

APPROVED:

GEOFFREY BEENE, INC.

By: _____
       Name: Geoffrey Beene
       Title: President

B - 2

# EXHIBIT 2

## AMENDMENT TO LICENSE AGREEMENT

**THIS AMENDMENT TO LICENSE AGREEMENT**, dated September 3o___, 2005, by and between Geoffrey Beene, Inc. ("**Licensor**") and Allegiance Apparel Group, LLC ("**Licensee**"), hereby amends that certain License Agreement of the parties dated as of November 15, 2000 (the "**License Agreement**") as set forth below.    Unless otherwise defined herein or the context clearly requires otherwise, all capitalized terms herein shall have the meanings given to them in the License Agreement.

### BASIC TERMS

1.   <u>Men's Products</u>.    Section 2 of the Basic Terms is hereby amended to delete "fashion underwear", provided, however, that Licensee may sell boxer shorts as part of a loungewear or sleepwear set or collection, provided that such items are not sold in "underwear" departments.

2.   <u>Term</u>. Section 4(b) of the Basic Terms, entitled "**Options to Extend**", is hereby amended as follows:

 a.    Licensee shall have two (2) options (each, an "**Option Period**") to extend the Term.  The first Option Period covering the years 2004-2006 is hereby deemed to have been exercised by the Licensee in accordance with the terms of the License Agreement, but subject to the amendments set forth herein.

 b.    The Third Option Period is hereby deleted.

3.   <u>Fees</u>.

 a.    Section 6(a) of the Basic Terms, entitled "**Guaranteed Minimum Fee**", is hereby amended as follows:

| Annual Period<br>(First Option Period) | Guaranteed Minimum Fee |
|---|---|
| 4  (ending December 31, 2004) | $250,000 |
| 5  (ending December 31, 2005) | $175,000 |
| 6  (ending December 31, 2006) | $200,000 |

| Annual Period<br>(Second Option Period) | Guaranteed Minimum Fee |
|---|---|
| 7  (ending December 31, 2007) | $250,000 |
| 8  (ending December 31, 2008) | $300,000 |
| 9  (ending December 31, 2009) | $350,000 |

b.    Section 6(b) of the Basic Terms, entitled **"Percentage Fee"**, is hereby amended so that the Percentage Fee shall be 6% of Net Sales Per Annual Period, irrespective of sales volume.

c.    Section 6(c) of the Basic Terms, entitled **"Payment: First Annual Period"**, is hereby amended so that the balance of the Guaranteed Minimum Fee for the Fifth Annual Period ($100,000) shall be paid as follows:  $50,000 upon signing of this Amendment and $50,000 on October 1, 2005.

4.    <u>Guaranteed Minimum Net Sales</u>.    Section 7 of Basic Terms is hereby deleted in its entirety and replaced with the following:

Licensee shall attain the following annual guaranteed minimum Net Sales of Men's Products (**"Guaranteed Minimum Net Sales"**), during the referenced Years of which at least fifty (50%) shall consist of Net Sales of Men's Products utilizing the "GEOFFREY BEENE" mark in department stores and better specialty stores:

| Annual Period (First Option Period) | Guaranteed Minimum Net Sales |
|---|---|
| 4 (ending December 31, 2004) | n/a |
| 5 (ending December 31, 2005) | n/a |
| 6 (ending December 31, 2006) | $3,333,333 |

| Annual Period (Second Option Period) | Guaranteed Minimum Net Sales |
|---|---|
| 7 (ending December 31, 2007) | $4,166,666 |
| 8 (ending December 31, 2008) | $5,000,000 |
| 9 (ending December 31, 2009) | $5,833,333 |

5.    <u>Notices</u>. Section 10 of the Basic Terms as applies to the Licensee is hereby deleted in its entirety and replaced with the following:

To Licensee:

Allegiance Apparel Group, LLC
1599 Post Road East
Westport, Connecticut 06880
Attn:  Alan Rummelsburg
Tel.: (203) 319-3600
Fax: (203) 319-3610

## STANDARD TERMS AND CONDITIONS

1.    Fees and Reporting.

a.    Section 3(a)(3) of the Standard Terms and Conditions is hereby deleted in its entirety and replaced with the following:

"In the event of the termination of this Agreement pursuant to paragraph 11 (other than a termination in connection with a breach by Licensee of Paragraph 7 of the Basic Terms), all amounts due in payment of Guaranteed Minimum Fee Payments for the balance of the Initial Term, or, if this Agreement has been extended, the then current Option Period, shall immediately, without notice or demand, become due and payable."

b    Section 3(c) of the Standard Terms and Conditions, entitled "Net Sales", is hereby clarified to confirm that Licensee may not deduct its costs for "customs duty" and "freight" from the invoiced amount of Articles sold.

c.    Section 3(f) of the Standard Terms and Conditions is hereby amended to incorporate a settlement of the parties with respect to the audit conducted by Licensor for the 2001 and 2002 Annual Periods ("**2001-2002 Audit**").  In connection with the 2001-2002 Audit, the parties have agreed that the royalty shortfall (including associated late charges and interest) claimed as a result of deductions taken by the Licensee for duty and freight shall be settled as follows:

(i)    Licensee shall pay to Licensor the sum of $300,000.00, which shall be payable in equal installments of $25,000.00 at the time that quarterly Guaranteed Minimum Fee payments are made during the Term, except that the first payment shall be made upon the signing of this Amendment.   In the event that the Term is not extended following the First Option Period or any subsequent agreed upon renewal term, the balance of the $300,000, which has not been satisfied by the installment payments, shall be paid by February 15 next following the last Annual Period of the Term.

(ii)    Licensor agrees that no royalty shortfall shall be claimed for deductions taken by Licensee for duty and freight charges during the 2003 and 2004 Annual Periods and hereby waives any right to audit or collect any such shortfall, provided, however, that Licensee will continue to cooperate with Licensor with respect to other open audit issues.

2.    Assignment; Binding Effect.  Section 13 of the Standard Terms and Conditions is hereby amended to delete subsection (z) relating to Christopher Healy.

## EXHIBIT A

1.    Exhibit A of the License Agreement is hereby amended to include Mervyn's as an approved account for the mark "GB by Geoffrey Beene" or such other derivative mark that may be authorized by Licensor from time to time.

Except as amended herein, the License Agreement shall remain in full force and effect, enforceable by its terms.

**IN WITNESS WHEREOF**, this Amendment has been executed by the parties as of the date first set forth above.

Geoffrey Beene, Inc.                                    Allegiance Apparel Group, LLC


By: _____                  By: _____
    Name: MARK EISIROVER                            Name: ALAN B. RUMMELSBURG
    Title: CFO                                                Title: CFO

# EXHIBIT 3

## SECOND AMENDMENT TO LICENSE AGREEMENT

**THIS SECOND AMENDMENT TO LICENSE AGREEMENT,** dated August 30, 2006, by and between Geoffrey Beene, Inc. ("Licensor") and Allegiance Apparel Group, LLC ("Licensee"), hereby amends that certain License Agreement of the parties dated as of November 15, 2000, as amended by that certain Amendment to License Agreement, dated as of ~~September 30   2005~~ (herein referred to collectively as the "**License Agreement**"). Unless otherwise defined herein or the context clearly requires otherwise, all capitalized terms herein shall have the meanings given to them in the License Agreement.

### BASIC TERMS

1.  <u>Term</u>. Section 4(b) of the Basic Terms, entitled **"Options to Extend"**, is hereby amended to extend the currently in effect First Option Period through December 31, 2007 and to amend the Second Option Period so that it includes the years 2008 and 2009 only.

2.  <u>Fees</u>.   Section 6(a) of the Basic Terms, entitled **"Guaranteed Minimum Fee"**, is hereby amended so that the Guaranteed Minimum Fee for the year 2007 shall be $125,000.00.

3.  <u>Guaranteed Minimum Net Sales</u>.   Section 7 of Basic Terms is hereby amended so that the annual guaranteed minimum Net Sales of Men's Products ("**Guaranteed Minimum Net Sales**") for the year 2007 shall be $2,083,333.33.

4.  <u>Distribution</u>.   Licensee agrees to design and sample a full line of loungewear products (approved by Licensor) to be offered for sale to department stores accounts.

5.  <u>Sell-Off</u>.   Section _11_ of the Basic Terms, entitled _Termination_ is hereby amended so that the sell-off period as provided for therein shall be 90 days.

6.  <u>Advertising.</u> All national advertising dollars not utilized for 2006 will be utilized for spring 2007

Except as amended herein, the License Agreement shall remain in full force and effect, enforceable by its terms.

**IN WITNESS WHEREOF,** this Second Amendment has been executed by the parties as of the date first set forth above.

Geoffrey Beene, Inc.

Allegiance Apparel Group, LLC

By: _____

By: _____

Name: _Merle Slass_

Name: ALAN B. RUMMELSBURG

Title: _EVP, President of Licensing_

Title: CFO

# EXHIBIT 4

*Eisikovic & Kane, LLP*

*Certified Public Accountants*
*1430 Broadway  Suite 1105*
*New York, N.Y. 10018*
*Telephone: 212-944-7733*
*Facsimile: 212-944-1041*

August 8, 2007

Mr. Alan Rummelsburg
Allegiance Apparel Group, LLC
1599 Post Road East
Westport, Connecticut 06880

      Re:    Geoffrey Beene, Inc. License - Compliance review
                for the period January 1, 2003 thorough December 31, 2006

Dear Mr. Rummelsburg:

Pursuant to the License Agreement dated November 15, 2000 between Geoffrey Beene, Inc. and Allegiance Apparel Group, LLC, ("Allegiance") as amended, we recently conducted a review of your firm's compliance with certain provisions of the License. The focus of our review was on your firm's compliance with the terms set forth for Advertising and to the timeliness of your royalty payments to the Licensor.

## *Advertising Expenditures*

Our review focused on two paragraphs of the original Agreement and Paragraph 6 of the Second Amendment to License Agreement dated August 30, 2006. Paragraph 9 of the original Agreement stipulates that:

> *"Licensee shall spend for regional and national advertising no less than an amount equal to the greater of (i) the aggregate of the Guaranteed Minimum Fee for such Annual Period and (ii) two percent (2%) of the Net Sales for such Annual Period, except that during the first and second Annual Periods, the Advertising Budget shall be set at two percent (2%) of the Net Sales for each such Annual Period."*

Paragraph 7(b)(3) of the Standard Terms and Conditions portion of the original license agreement states that:

> *"In the event that during any Annual Period Licensee has not in fact spent the entire portion of the Advertising Budget not required to be remitted to Licensor, then Licensee shall remit*

Page 2 of 7
Mr. Alan Rummelsburg
Allegiance Apparel Group, LLC
August 8, 2007

>   *to Licensor, within 90 days after the end of such annual period,*
>   *the balance of the Advertising Budget, without credit to the*
>   *Advertising Budget for the then current Annual Period."*

Paragraph 6 of the Second Amendment to License Agreement stipulates that:

>   *"All national advertising dollars not utilized for 2006 will*
>   *be utilized for spring 2007."*

Based on the above Allegiance must refer to (a) actual sales and (b) the guaranteed
minimum fee to determine the annual advertising requirement. Set forth below are
the reported sales and the guaranteed minimum fees for the periods being reviewed.

| Period | Sales | 2% of Sales | Guaranteed minimum fees |
|---|---|---|---|
| 1/1/03 – 12/31/03 | $10,357,282 | $ 207,146 | $ 200,000 |
| 1/1/04 – 12/31/04 | 8,418,362 | 168,367 | 250,000 |
| 1/1/05 – 12/31/05 | 1,921,073 | 38,421 | 175,000 |
| 1/1/06 – 12/31/06 | 1,515,236 | 30,305 | 200,000 |

Based on the terms of the Agreement, Allegiance was obligated to expend (or remit
to the Licensor) for advertising the following sums:

| Period | Expenditure based on | Required Expenditure |
|---|---|---|
| 2003 | Actual sales | $ 207,146 |
| 2004 | Guaranteed Minimums | 250,000 |
| 2005 | Guaranteed Minimums | 175,000 |
| 2006 | Guaranteed Minimums | 200,000 |
| Total Required | | $ 832,146 |

We have reviewed information and documentation provided by your office in
support of claimed Advertising expenditures. Reflected below, by year, is a
schedule of Advertising expenditures claimed or payments made by the Licensee.

*Eisikovic & Kane, LLP*

Page 3 of 7
Mr. Alan Rummelsburg
Allegiance Apparel Group, LLC
August 8, 2007

| Period | Expenditure for | Comments | Amount expended |
|--------|-----------------|----------|-----------------|
| **2003** | | | |
| | | Detail to be obtained | $  28,000.00 |
| 4/2/04 | Unexpended sums | Paid to Licensor | 179,146.44 |
| **Total 2003** | | | $ 207,146.44 |
| | | | |
| **2004** | | | |
| 4/30/2004 | NY Times | | $  18,500.00 |
| 4/19/04 | NY Times | | 18,500.00 |
| 11/18/04 | NY Times 11/1-8 | | 28,000.00 |
| 11/30/04 | GBI Approved Ad | Ad placed in NY Times | 63,750.00 |
| | Miscellaneous | Various Ad Expenses | 13,713.01 |
| **Total 2004** | | | $142,463.01 |
| | | | |
| **2005** | No advertising | | |
| | | | |
| **2006** | | | |
| **Total 2006** | NY Yankees | Yearbook | $ 24,500.00 |

*Conclusions on advertising expenditures*

*Deficiency under paragraph 9*

Based upon our review Allegiance has failed to meet the advertising expenditure
requirements pursuant to Paragraphs 9 of the License and has failed, pursuant to
Paragraph 7 of the Standard Terms and Conditions portion of the Agreement, to
remit to the Licensor amounts due as required. In addition, Allegiance has failed,
pursuant to Paragraph 6 of the Second Amendment to the License Agreement, to
spend for Advertising the required unexpended 2006 amount.

*Eisikovic & Kane, LLP*

Page 4 of 7
Mr. Alan Rummelsburg
Allegiance Apparel Group, LLC
August 8, 2007

Based on the above the Advertising deficiency for the period from January 1, 2003 through December 31, 2006 is detailed below:

|  | 2003 | 2004 | 2005 | 2006 | Total |
|---|---|---|---|---|---|
| Required Expenditure | $207,146 | $250,000 | $175,000 | $200,000 | $832,146 |
| Actual Expenditure | (207,146) | (142,463) | - | (24,500) | (374,109) |
| Total deficiency | $ 0 | $107,537 | $175,000 | $175,500 | $458,037 |

*Timeliness of Payments*

The Agreement calls for interest to be paid on any deficiencies at the rate of 3% over the prime rate published on the original due date until such deficiency is paid. Paragraph 11(a) stipulates:

*"If Licensee shall fail to pay any amount due hereunder within seven days of the date on which such payment is due, (A) Licensee agrees to pay interest, at a rate equal to the lesser of (i) three percent per annum over the prime rate being charged in New York City by Marine Midland Bank as of the close of business on the date the payment first becomes due and (ii) the highest rate then permitted by law, on such amount remaining unpaid from time to time from and including the date such amount becomes due until the date such amount is paid in full".*

The following tables reflect royalty payment dates and interest due on late payments:

|  | Due by | Paid | Amount Due | Days Late | Prime + 3% | Interest |
|---|---|---|---|---|---|---|
| **2003** |  |  |  |  |  |  |
| 1st Quarter | 1/1/03 | 1/15/03 | 50,000.00 | 14 | 7.25 | $ 139.04 |
| 2nd " | 4/1/03 | 4/7/03 | 50,000.00 | 6 | n/a | — |
| 3rd " | 7/1/03 | 7/16/03 | 50,000.00 | 15 | 7.00 | 143.84 |
| 3rd Q override | 10/30/03 | 11/20/03 | 122,148.79 | 20 | 7.00 | 468.52 |
| 4th Quarter | 10/1/03 | 10/9/03 | 50,000.00 | 8 | 7.00 | 76.71 |
| 4th Q override | 2/15/04 | 3/9/04 | 245,717.29 | 22 | 7.00 | 1,036.73 |
| Total interest on late payments |  |  |  |  |  | $1,864.84 |
| **2004** |  |  |  |  |  |  |
| 1st Quarter | 1/1/04 | 1/16/04 | 62,500.00 | 15 | 7.00 | $ 79.79 |
| 2nd " | 4/1/04 | 4/5/04 | 62,500.00 | 4 | n/a | — |
| 3rd " | 7/1/04 | 7/9/04 | 62,500.00 | 8 | 7.25 | 99.32 |
| 4th " | 10/1/04 | 10/8/04 | 62,500.00 | 7 | 7.75 | 67.78 |
| Total interest on late payments |  |  |  |  |  | $ 346.89 |

*Eisikovic & Kane, LLP*

Page 5 of 7
Mr. Alan Rummelsburg
Allegiance Apparel Group, LLC
August 8, 2007

| | Due by | Paid | Amount Due | Days Late | Prime + 3% | Interest |
|---|---|---|---|---|---|---|
| **2005** | | | | | | |
| 1st Quarter | 1/1/05 | 1/16/05 | 75,000.00 | 15 | 8.25 | $  254.28 |
| 2nd " | 4/1/05 | – | (*) | n/a | | – |
| 3rd " | 7/1/05 | 10/22/05 | 100,000.00 | n/a | | – |
| 4th. " | 10/1/05 | – | (*) | n/a | | – |
| Total interest on late payments | | | | | | $  254.28 |

(*) Contract renegotiated after first payment was made. Amended contract signed in September 2005. Total Minimum Guaranteed fee for 2005 set at $175,000.00. No calculation of late payment interest performed for remainder of period.

| | Due by | Paid | Amount Due | Days Late | Prime + 3% | Interest |
|---|---|---|---|---|---|---|
| **2006** | | | | | | |
| 1st Quarter | 1/1/06 | 1/23/06 | 100,000.00 | 15 | 10.25 | $  421.23 |
| 2nd " | 4/1/06 | 4/17/06 | 75,000.00 | 16 | 10.75 | 353.42 |
| 3rd " | 7/1/06 | 8/11/06 | 75,000.00 | 6 | n/a | – |
| 4th " | 10/1/06 | 10/5/06 | 75,000.00 | 4 | n/a | – |
| Total interest on late payments | | | | | | $  774.66 |

In addition to the interest calculated on the late royalty payments Allegiance is liable for interest at 3% over prime rate for all deficiencies until they are actually paid. This interest calculation also applies to unexpended advertising that is payable to the licensor pursuant to paragraph 7(b)(3) of the Standard Terms and Conditions.

*Eisikovic & Kane, LLP*

Page 6 of 7
Mr. Alan Rummelsburg
Allegiance Apparel Group, LLC
August 8, 2007

The following table reflects the calculation of interest due as of August 31, 2007 for the shortfalls in advertising expenditures. Pursuant to the License Agreement this sum is to be remitted to the Licensor:

|      | Due by  | Amount Due | Days Late | Prime + 3% | Interest     |
|------|---------|------------|-----------|------------|--------------|
| 2004 | 3/30/05 | 107,537.00 | 883       | 8.75       | $ 22,763.23  |
| 2005 | 3/31/06 | 175,000.00 | 518       | 10.75      | 26,698.29    |
| 2006 | 3/31/07 | 175,500.00 | 153       | 11.25      | 8,276.15     |

Total interest on deficiencies                                          $ 57,737.67

### License Audit Costs

Based on our findings and pursuant to paragraph 3(f)(2) of the Standard Terms and Conditions portion of the license agreement:

> "If, as a result of any examination of Licensee's books and records, it is shown that Licensee's fee payments or Advertising Budget expenditures for any period were less than the amount which should have been paid and/or expended for such period,.....if either fee payments or the Advertising Budget expenditures were less than the sum that should have been paid or expended by an amount equal to at least five percent of the fee of Advertising Budget expenditure actually paid/or expended during such period, Licensee shall also reimburse the Licensor for the cost of such examination."

As of this writing the final cost for the audit has not been established, however we estimate it to be $5,000.00.

### Summary

Allegiance has not expended the required advertising under the terms of the license agreement and has failed to remit unexpended Advertising monies to the Licensor. In addition Allegiance has a liability for interest due on the late payment of royalties.

*Eisikovic & Kane, LLP*

Page 7 of 7
Mr. Alan Rummelsburg
Allegiance Apparel Group, LLC
August 8, 2007

Presented below is a summary of amounts owed.

| Period | Shortfall in Advertising Expenditures | Interest on late payment of quarterly royalties | Interest on late payment of unexpended advertising | Total due by period |
|--------|--------|--------|--------|--------|
| 2003 | $        – | $1,864.83 | $        – | $   1,864.83 |
| 2004 | 107,537.00 | 346.89 | 22,763.23 | 130,647.12 |
| 2005 | 175,000.00 | 254.28 | 26,698.29 | 201,952.57 |
| 2006 | 175,500.00 | 774.66 | 8,276.15 | 184,550.81 |
| Total | $458,037.00 | $3,240.66 | $ 57,737.67 | 519,015.33 |

Reimbursement of examination costs                                            5,000.00

Total due and payable to Geoffrey Beene, Inc.                        $524,015.33

Sincerely,

Max Eisikovic, CPA
Eisikovic & Kane, LLP

cc:     G. Thompson Hutton, Esq.

*Eisikovic & Kane, LLP*

# EXHIBIT 5

# GEOFFREY BEENE

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

August 20, 2007

Mr. Alan Rummelsburg
Allegiance Apparel Group, LLC
1599 Post Road East
Westport, Connecticut 06880

Dear Mr. Rummelsburg:

### EISIKOVIC & KANE, LLP REPORT

Reference is made to the report dated August 8, 2007 by Eisikovic & Kane, LLP wherein a determination was made that, pursuant to the terms and conditions of the License between Geoffrey Beene, Inc. and Allegiance Apparel Group, LLC., $524,015.33 was due Geoffrey Beene, Inc.

I would appreciate it if you would provide me, no later than August 27, 2007, with your firm's position with respect to the findings in the report.

Please contact me if you have any questions or require additional information.

Sincerely,

Sheila Tarlowe
Controller

1430 Broadway, Suite 1105, New York, NY 10018
Tel: 212-213-1668 – Fax: 212-944-1041

# EXHIBIT 6

# GEOFFREY BEENE

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

August 28, 2007

Mr. Alan Rummelsburg
Allegiance Apparel Group, LLC
1599 Post Road East
Westport, Connecticut 06880

Dear Mr. Rummelsburg:

## NOTICE OF DEFAULT UNDER LICENSE AGREEMENT

Reference is made to the License Agreement dated as of November 15, 2000 between Geoffrey Beene, Inc. and Allegiance Apparel Group, LLC ("Allegiance") and to the report dated August 8, 2007 by Eisikovic & Kane, LLP wherein a determination was made that $524,015.33. was due Geoffrey Beene, Inc. pursuant to the terms and conditions of the License.

Based on Allegiance's failure to meet its obligations as stipulated in the License Agreement, Geoffrey Beene, Inc. has determined that Allegiance is in default with respect to their obligations under Paragraph 9 of the Basic Terms of the License Agreement and under Paragraph 7(b)(3) of the Standard Terms and Conditions of the License Agreement. If payment in full is not received within 7 days from the date of this letter, Geoffrey Beene, Inc. reserves its right to terminate the License Agreement and invoke its rights under Paragraph 11 of the Standard Terms and Conditions of the License Agreement.

Please contact me if you have any questions or require additional information.

Sincerely,

Sheila Tarlowe
Controller

cc: Tom Sargent, Esq.
    Sargent & Sargent, LLC
    830 Post Road East
    Westport, CT 06831

**1430 Broadway, Suite 1105, New York, NY 10018**
**Tel: 212-213-1668 – Fax: 212-944-1041**

# EXHIBIT 7

# GEOFFREY BEENE

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

September 19, 2007

Mr. Alan Rummelsburg
Allegiance Apparel Group, LLC
1599 Post Road East
Westport, CT 06880

Re:  Geoffrey Beene, Inc.

Dear Mr. Rummelsburg:

### NOTICE OF TERMINATION

Reference is made to the License Agreement dated as of November 15, 2000 and Amendments dated September 30, 2005 and August 30, 2006 between Geoffrey Beene, Inc. and Allegiance Apparel Group, LLC. Reference is also made to the "Notice of Default under License Agreement" dated August 28, 2007 wherein you were notified that Allegiance Apparel Group, LLC was in default with respect to their obligations under Paragraph 9 of the Basic Terms of the License Agreement and under Paragraph 7(b)(3) of the Standard Terms and conditions of the License. As indicated in the Notice of Default, Geoffrey Beene, Inc. reserved its right to terminate the License Agreement and invoke its rights under Paragraph 11 of the Standard Terms and Conditions of the License Agreement.

Paragraph 11 (a) (1) (B) of the License Agreement stipulates that "if such default shall continue uncured for a period of fifteen days after written notice thereof has been given by Licensor, Licensor shall have the right to terminate this Agreement, which termination may be automatic, at the option of the Licensor, upon notice thereof in the Notice of Default or in any subsequent notice to Licensee".  Allegiance Apparel Group, LLC has failed to cure the Notice of Default.

Geoffrey Beene, Inc. hereby terminates the License Agreement between the companies and invokes its rights under Paragraph 11 of the Standard Terms and Conditions of the License Agreement.

Paragraph 3 (a) (3) of the Standard Terms and Conditions stipulates that "In the event of the termination of this Agreement pursuant to Paragraph 11, all amounts due in payment of Guaranteed Minimum Fees for the balance of the Initial Term, or, if this Agreement has been extended, the then current Option Period, shall immediately, without notice or demand, become due and payable".

Page 2 of 2
Mr. Alan Rummelsburg
September 19, 2007

As reflected on the attached schedule the amount due Geoffrey Beene, Inc. as of the date of this letter is $ 780,265.33.

Please be advised that inasmuch as your license has been terminated a limited sell off period exists for your firm to liquidate any remaining Geoffrey Beene, Inc. Men's Products. Paragraph 8(c) of the License (as amended) stipulates that "Licensee shall have 90 days from the date of notice of such termination to complete pending orders then in production and to ship such orders. In no event may Licensee take new orders after notice of such termination, except to liquidate Men's Products covered by this Paragraph 8(c) that are in production but not yet sold, and in no event may new orders be taken for such Men's Products".

Pursuant to Paragraph 11 (a) Geoffrey Beene, Inc. reserves all rights and remedies which it has with respect to the collection of fees payable by Licensee, with respect to damages for breach of this agreement by Licensee, and with respect to the recovery of all costs incurred by Licensor as result of the breach of this Agreement by Licensee, including without limitation all legal fees and expenses, and to enjoin the unlawful and unauthorized use of the Licensed Mark.

Please contact me if you have any questions or require additional information with respect to this Notice of Termination.

Sincerely,

Sheila Tarlowe

Sheila Tarlowe
Controller

cc: Tom Sargent, Esq.
    Sargent & Sargent, LLC
    830 Post Road East
    Westport, CT 06831

<u>Schedule of amounts due upon termination of License Agreement</u>

<u>Quarterly Minimum fees</u>

Quarterly Minimum due October 1, 2007                                    $    31,250.00
(Section 2 (Fees) of Basic Terms – Guaranteed Minimum Fee - 2nd Amendment)

<u>Balance of 2001 – 2002 Audit Fees pursuant to Agreement dated September 30, 2005</u>
(Section 1 ( c ) ( i ) – Standard Terms & Conditions – 1st Amendment)

Fees due October 1, 2007
                                                                                   25,000.00
Fees due February 28, 2008
                                                                                   75,000.00

<u>Advertising</u>

Amount due pursuant to Eisikovic & Kane, LLP report dated August 8, 2007
                                                                                  524,015.33

Advertising fees due for 2007
                                                                                  125,000.00

Balance due Geoffrey Beene, Inc.                                        $    780,265.33